**Terry DEGRAW, Plaintiff,**

v.

**EXIDE TECHNOLOGIES, Defendant.**

**Case No. 09–4016–RDR.**

United States District Court,
D. Kansas.

Oct. 13, 2010.

Opinion Denying Reconsideration
Dec. 13, 2010.

David O. Alegria, McCullough, Wareheim & Labunker, P.A., Topeka, KS, for Plaintiff.

Michael F. Delaney, Melody L. Rayl, Overland Park, KS, for Defendant.

### MEMORANDUM AND ORDER

RICHARD D. ROGERS, District Judge.

Plaintiff has filed an action alleging that defendant violated state law by retaliating against plaintiff for exercising his rights under the State of Kansas workers' compensation statute. Plaintiff also alleges that defendant violated the Family and Medical Leave Act ("FMLA") by unlawfully retaliating against and interfering with plaintiff's exercise of his FMLA rights. This case is before the court upon defendant's motion for summary judgment.

### I. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper if it is demonstrated that the movant is entitled to judgment as a matter of law on the basis of facts to which there is no genuine dispute. The court must determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* at 248, 106 S.Ct. 2505. There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court may not act as the jury and determine witness credibility when it examines the record upon a summary judgment motion. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986) *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The evidence and all reasonable inferences therefrom are construed in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.) *cert. denied*, 537 U.S. 816, 123 S.Ct. 84, 154 L.Ed.2d 20 (2002).

### II. UNCONTROVERTED FACTS

Unless noted otherwise, the following facts are either uncontroverted or shall be considered uncontroverted for the purposes of this memorandum and order.

Plaintiff was hired by defendant on or about August 20, 2001 to perform the job of a "material handler" at defendant's plant in Salina, Kansas. When plaintiff was hired he received instructions regarding defendant's policy for reporting workplace injuries. The physical requirements of the job included: 1) manually handling

5–pound to 80–pound batteries; 2) occasionally (with assistance) lifting batteries weighing between 80 and 120 pounds; 3) moving or carrying wood pallets weighing up to 40 pounds over short distances; and 4) continuous standing, walking or riding a truck twelve hours a day. In 2005, plaintiff signed a job description for the position of senior material handler. The job description stated that a senior material handler should among other tasks: perform all material handler functions; occasionally lift 30 to 40 pounds; and engage in walking, sitting, lifting, bending and twisting.

Plaintiff's medical history shows that plaintiff complained of back pain and missed work at different times over a period of years. Plaintiff had a four-wheeler accident in 2002 which caused some back pain and led plaintiff to miss a few days of work. An x-ray showed mild degenerative change at the L5–S1 vertebra.

Plaintiff also missed five months of work in 2003 because of a hernia operation and a motorcycle accident which happened while he was recovering from the operation.

In January 2005 plaintiff fell from a ladder in his garage and injured his back. He missed a few days of work. In August 2005 plaintiff's doctor—Dr. Bossemeyer—diagnosed plaintiff with left leg numbness secondary to an irritated nerve from a low back strain. He noted that plaintiff had had episodes of low back pain on and off for many years.

Plaintiff saw Dr. Bossemeyer on June 2, 2006 complaining of low back pain and pain radiating into his right leg. Plaintiff did not indicate to Dr. Bossemeyer that there was a specific cause of the pain and did not say that his work activities caused the pain. Dr. Bossemeyer diagnosed plaintiff with possible L5–S1 radiculopathy, prescribed pain medication, and instructed plaintiff to take some time off work.

On June 7, 2006 plaintiff had a CT scan. The radiology report contained the following impression:

A prominent right paracentral disk herniation is … felt to be present at L4–L5 that measures 1.2 × 0.8 cm and is associated with right nerve root compression and acquired central canal narrowing to 7 mm.

Moderate degenerative disk disease at L5–S1 with moderate to severe narrowing of the disk space and face joint arthropathy. The central canal caliber remains within normal limits but there is right neural foraminal stenosis with right nerve root compression.

Doc. No. 95, Exhibit 11. The radiologist recommended a follow-up MRI to confirm the findings. But, as will be discussed, an MRI was not ordered until December 2006.

Plaintiff had an epidural steroid injection on June 14, 2006 with minimal results. About this time, Dr. Bossemeyer diagnosed plaintiff with degenerative disc disease and placed the following work restrictions upon plaintiff: no pushing/pulling over 25 pounds; no continuous lifting over 25 pounds; no frequent lifting over 25 pounds; no repetitive bending or stooping; no squatting or kneeling; no prolonged standing or working—should be sitting 50% of the time.

On June 21, 2006 plaintiff had a follow-up visit to Dr. Bossemeyer. Plaintiff reported no significant pain and said he wanted to return to work. Dr. Bossemeyer noted that plaintiff's job required him "very intermittently" to lift up to 60 pounds, but for the most part plaintiff lifted 10 or 15 pounds intermittently and drove a forklift. Dr. Bossemeyer wrote that plaintiff could go back to work with no restrictions.

However, plaintiff then traveled by car from Salina, Kansas to Colorado Springs.

This aggravated his back pain. When he returned, he saw Dr. Hanson. Dr. Hanson is a physician at the Salina Clinic who is under contract to perform examinations for defendant to determine whether employees on medical leave can return to work. Dr. Hanson had previously seen plaintiff for return to work examinations in 2003 and 2005. On June 26, 2006, Dr. Hanson noted that plaintiff felt he was not capable of returning to work. Dr. Hanson found that plaintiff was having "tremendous discomfort." Doc. 95, Ex. 13 at p. 5. He determined that plaintiff had degenerative disc disease and told plaintiff that he was released from work until his personal physician (Dr. Bossemeyer) said otherwise.

Plaintiff received a second epidural steroid injection on June 29, 2006. He indicated on a pain history taken at that time that his pain "just began," not that it was caused by work. He noted that the pain started over two years ago.

Plaintiff saw Dr. Hanson again on July 11, 2006 and reported that his pain was completely gone and he wished to return to work on July 16, 2006. Dr. Hanson approved plaintiff to return to work. Plaintiff did return to work on July 16, 2006.

On August 7, 2006 plaintiff reported to defendant's nurse's station while at work and spoke with Gidget Ramsey, a nurse for defendant. Plaintiff reported that he had pain in his back, perhaps because of working overtime. Plaintiff has testified that he told Ramsey:

> "I'm fresh from feeling better from this injury that I'm off of and then they want to put me working sixty, seventy hours a week on jobs that is not even my job . . . No wonder, you know, I got pain coming back again."

Doc. No. 95, Ex. 28 at p. 10 (p. 47 of plaintiff's deposition). Plaintiff has also testified that he asked Ramsey to help him file a work injury report or a workers' compensation claim. We accept this testimony as true for the purposes of this order.

Nurse Ramsey recorded her recollection of the encounter in a memo which states:

> [Employee] reports to nurse's station & asks what he can do about his back pain. [Employee] then continues to report that he is tired of working 60 hrs. a week and feels like maybe his job has caused his back pain. Reports that his doctor did not want to release him to return to work but he said he couldn't live of[f] his STD [short-term disability] check and needed to get back to work. [Employee] was seen by Dr. Hanson on 7/11/06 and reported that his pain was completely gone. Dr. Hanson released him to return to work on 7/16/06. [Employee] reports to this nurse that the pain has never gone away and again says working 60 hrs. is crazy and I'm tired of being told that since I have low seniority that it's mandatory that I work overtime. Continues to report that DC has it's own set of rules & tired of it. Instructed [employee] to talk [with] John Pfeiffer about his concern [regarding] the overtime. I then instructed [employee] to fill out an accident report if he felt like his back injury was [due to] his job. [Employee] reported that he will talk [with] John Pfeiffer. Ended the conversation by reminding [employee] to come back to the nurse's station and fill out an accident investigation/incident report if he felt this was a work related injury.

Doc. No. 95, Ex. 17. Plaintiff disputes that Nurse Ramsey told him to fill out a work injury report or did anything other than direct plaintiff to speak to John Pfeiffer. The court accepts plaintiff's version of this matter for the purposes of the motion for summary judgment. Plaintiff did not fill out an injury report, and Ramsey did not fill out an injury report for plaintiff.

When Nurse Ramsey does new employee orientation, she explains the employee handbook policy about reporting injuries and points out where the forms for reporting injuries are located. Such forms were available at the nurse's station.

On August 9, 2006, plaintiff received a third epidural steroid injection. He saw Dr. Bossemeyer on August 10, 2006. Dr. Bossemeyer wrote:

Pt. has a herniated disc. He has had 3 epidurals now. They really have not made his back a lot better. He is in a less demanding job at work, but he still is having problems. He needs to stay at work, if at all possible. He has had his last epidural 2 days ago, which really is not enough time to know for sure whether this one is going to help him or not. He certainly would be a difficult person to do surgery on. He is quite large at 380–some pounds.

No specific objection evaluation was done today.

Doc. 95, Ex. 9 at p. 2.

Plaintiff saw Dr. Bossemeyer because John Pfeiffer, plaintiff's supervisor, called him at home and told him he needed another medical release to come back to work. Dr. Bossemeyer gave plaintiff a note excusing him from work until August 13, 2006. At some point before or after the visit to Dr. Bossemeyer, plaintiff was instructed by defendant not to return to work pending additional medical clearance.

Plaintiff saw Dr. Hanson on August 22, 2006 for a fitness-for-duty examination.[1] By this point, Dr. Hanson had received and reviewed plaintiff's CT scan from June 2006. Dr. Hanson wrote:

This 36–year–old gentleman finished his third epidural steroid about two weeks ago. He has been given a release to return to work by Dr. Bossemeyer. Even though he is feeling fairly well having been off work this period of time he is concerned that the last two wore off fairly quickly and I am concerned that the CT done on 06/07/06 shows a right paracentral disc herniation at L4–L5 that is associated with right nerve compression and acquired central canal narrowing to 7 mm and at L5–S1 there is moderate to severe narrowing of the disc space with facet joint arthropathy, but there is right neuroforaminal stenosis. There is right nerve compression as well. My biggest fear is that when this gentleman returns back to job description at Exide that when the epidural begin[s] to wear off it may cause further degenerative changes in his back. The patient stated that when he is having discomfort he notices weakness and hesitancy in his right leg. He cannot stand for long or sit for very long, or even lie any comfortable position except on his belly. . . . .

The patient has been advised not to return to work, but to visit with his personal physician Dr. Bossemeyer and to seek an opinion from a neurosurgeon.

Doc. No. 95, Ex. 13 at p. 8. A medical leave of absence request form used for FMLA leave was filled out for plaintiff on August 22, 2006. The form indicates that the request was approved by plaintiff's supervisor on that date. However, plaintiff did not sign the form.

Plaintiff consulted with Dr. Bossemeyer who referred him to Dr. Manguoglu, a neurosurgeon. On September 5, 2006 Dr.

---

1. In his deposition, Dr. Hanson was unfamiliar with the term "fitness-for-duty examination" and said that he did not perform such an examination on plaintiff. Doc. No. 102, Ex. E at p. 68. However, the record appears clear that Dr. Hanson saw plaintiff at least three times in 2006, as well as in 2003 and 2005, for the purpose of determining whether plaintiff should be released to return to work.

Manguoglu noted that plaintiff presented a history of back and bilateral leg discomfort which started more than a year earlier. He diagnosed plaintiff with a large disc herniation at the L4–5 vertebra, a moderate degree of spinal stenosis, and a large disc bulge at the L5–S1 vertebra. Plaintiff told Dr. Manguoglu that his pain had completely disappeared after his third epidural steroid injection. The doctor did not recommend surgery, but advised plaintiff against heavy lifting, bending or twisting. He also advised plaintiff to seek treatment from a chiropractor, Dr. Eisenhauer. Later Dr. Manguoglu wrote a note indicating that plaintiff's care had been transferred to Dr. Eisenhauer and that Dr. Eisenhauer would determine plaintiff's work restrictions.

Plaintiff saw Dr. Eisenhauer on October 9, 2006 and reported that his pain was a 10 on a 1–to–10 scale. Plaintiff completed a pain survey which stated that plaintiff could not lift heavy weights, could not walk more than a quarter mile, could not sit for more than one hour, could not stand for longer than a half-hour, and that his pain was gradually worsening. On October 16, 2006 Dr. Eisenhauer wrote that plaintiff should not work until the completion of a six-week treatment program which began on October 9. He advised at that time that plaintiff should not exert himself or engage in lifting, bending or prolonged sitting or standing. After a series of treatments, Dr. Eisenhauer found that plaintiff responded well to therapy and released plaintiff to return to work on November 27, 2006.

Plaintiff relayed Dr. Eisenhauer's release to defendant and was instructed to

see Dr. Hanson. Dr. Hanson saw plaintiff on December 7, 2006. Dr. Hanson wrote that he decided to "follow the radiologist's recommendations to get an MRI so that we can know what we are dealing with and be able to put on appropriate work restrictions." Doc. No. 95, Ex. 13 at p. 8. The MRI was conducted on December 15, 2006 and the results were faxed to Dr. Hanson on December 19, 2006. Dr. Hanson determined that the MRI results were consistent with the CT scan performed in June 2006. He concluded in an undated memo that: "my recommendations are that [plaintiff] avoid repetitive bending, stooping, lifting, twisting and climbing, and to avoid lifting more than 20 pounds." Doc. No. 95, Ex. 13 at p. 9. He further noted that those restrictions were not consistent with plaintiff's job requirements as a material handler.

On December 21, 2006 plaintiff had a meeting with Jayne Cornish and Cathy Carpenter. Cornish was defendant's human resources manager. She started working for defendant on September 25, 2006. Carpenter was defendant's environmental health and safety supervisor for the Salina plant. During the meeting, plaintiff said he felt fine and could bench press 400 pounds and do other heavy lifting. He was trying to make clear that he had no restrictions and wanted to work. Nevertheless, defendant determined that there was no job which plaintiff could perform at the Salina plant consistent with the physical restrictions placed upon him by Dr. Hanson.[2] Plaintiff asked Cornish whether defendant's position would be different if he claimed his back injury was work-related.[3] Doc. No. 95, Ex. 2 at p. 19 (p. 73 of

---

**2.** Plaintiff claims that Dr. Hanson never gave him work restrictions. Dr. Hanson may not have told plaintiff the work restrictions he communicated to Jayne Cornish. But, this does not create a jury issue as to what Dr. Hanson told Jayne Cornish.

**3.** This statement is referred to in plaintiff's response to defendant's summary judgment motion, although it is not included in either side's list of uncontroverted facts.

deposition of Jayne Cornish). Plaintiff, however, never told Dr. Hanson that his back pain was work-related.

Defendant found no other job for plaintiff and plaintiff's employment was terminated on January 23, 2007. The decision to terminate plaintiff was a joint decision of Jayne Cornish and Jim York, the plant manager.

Before the discharge decision was made, defendant was aware that Cigna, the insurance company which issued short-term disability insurance for defendant's employees, had rejected plaintiff's claim for short-term disability insurance benefits on the grounds that plaintiff was not disabled from working for defendant as a material handler. This decision was made after Cigna reviewed medical information pertaining to plaintiff. Defendant asked Cigna to reconsider its decision, but the decision was not changed.

On January 16, 2007 Dr. Eisenhauer remarked that plaintiff should not engage in "excessive/repetitive bending or repetitive lifting over 40 pounds." Doc. No. 95, Ex. 19 at p. 12. This statement was made on a form in connection with plaintiff's application for unemployment benefits.

Plaintiff filed for workers' compensation benefits on February 2, 2007. His claim was ultimately denied on the basis that plaintiff failed to establish that he suffered an injury arising from his employment with defendant. In a November 30, 2007 pain survey, plaintiff indicated that lifting objects from 10 to 50 pounds gave him moderate pain, that turning and twisting gave him moderate pain, and rated his ability to return to work as "do not know."

Defendant's records show that plaintiff took FMLA leave and applied and received short-term disability benefits for the following time periods:

December 9, 2002—December 14, 2002
July 31, 2003—December 7, 2003
January 3, 2005—January 9, 2005
June 2, 2006—July 15, 2006; and
August 10, 2006—until the exhaustion of his FMLA leave
and short-term disability benefits.

Before August 2006, plaintiff did not experience any negative feedback or reaction when he took FMLA leave on different occasions while working for defendant. After August 2006, plaintiff was not chastised or criticized for taking leave from work.

Plaintiff received favorable evaluations and excellent marks for his job performance while working for defendant.

## III. PLAINTIFF'S CLAIMS

### A. *Workers' compensation retaliation*

Plaintiff claims that he was terminated from employment by defendant because plaintiff sustained a workplace injury for which he might file a workers' compensation claim.

Judge Lungstrum recently discussed the burden shifting approach applied to workers' compensation retaliatory discharge claims under Kansas law:

Kansas courts use a burden-shifting scheme whereby plaintiff is first required to present a prima facie case of retaliatory discharge. *Rebarchek v. Farmers Cooperative Elevator*, 272 Kan. 546, 553, 35 P.3d 892 (2001). To establish a prima facie case for retaliatory discharge in the workers' compensation context, plaintiff must establish four elements: (1) he filed a claim for workers' compensation benefits or sustained an injury for which he might assert a future claim for such benefits; (2) defendant had knowledge of plaintiff's claim or injury; (3) defendant terminated plaintiff's employment; and (4) a causal connection exists between the protected activity or injury and the termination of plaintiff's employment. *Id.* at 554, 35 P.3d 892.

Once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate nonretaliatory reason for terminating plaintiff's employment. *Id.* at 557, 35 P.3d 892. If defendant does so, the burden shifts back to plaintiff to present evidence tending to show that defendant's proffered reason for terminating plaintiff's employment is pretextual. *Id.* If plaintiff comes forward with evidence that raises genuine issues concerning defendant's motivation, then "he is entitled to test his case before a jury." *Id.* at 558, 35 P.3d 892.

*Scheffler v. United Parcel Service, Inc.,* 689 F.Supp.2d 1300, 1304 (D.Kan.2010).

■ Defendant makes four arguments for summary judgment against plaintiff's workers' compensation retaliatory discharge claim. First, defendant argues the doctrine of collateral estoppel. Defendant claims that plaintiff cannot make a prima facie showing that he suffered a workplace injury or that he was retaliated against because he may have suffered a workplace injury, because his workers' compensation claim was denied on the grounds that he did not suffer a workplace injury. We reject this argument. For a prima facie showing, it is enough if plaintiff had a reasonable good faith belief that he suffered a workplace injury and that defendant had knowledge of the injury. See *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir.2001) (protection against retaliation extended to employees who would be likely to file statutory claims). "The requisite 'causal connection' is the unlawful intent on the part of the employer to terminate the employee because the employee has filed a statutory claim, or has been injured and may file such a claim." *Id.* at 1116. "It is what the employer knew or should have known at the time of the discharge that is critical to a plaintiff's prima facie case and not what a plaintiff may or may not be able to prove

sometime after the discharge as to the actual cause of his absences." *Wilkins v. Kmart Corporation,* 2006 WL 3333744 at *9 (D.Kan.11/16/2006). In this case, at the time of plaintiff's discharge defendant knew or arguably should have known that plaintiff suffered an injury in August 2006 for which he reasonably could make a claim for workers' compensation benefits.

Next, defendant argues that plaintiff cannot make a prima facie showing of a retaliatory discharge because he and the doctors who treated him continually indicated that his back pain was not work related. The court also rejects this argument. The alleged injury is consistent with the type of work plaintiff performed for defendant. When he reported to the nurse's station on August 7, 2007, his comments (as described in plaintiff's deposition and the nurse's written statement) could be construed as reporting a workplace injury. In addition, plaintiff suggested to Jayne Cornish that he might claim the back injury was caused at work during the December 21, 2006 meeting. Construing the evidence in a light most favorable to plaintiff, a reasonable jury could find that plaintiff had a reasonable good faith belief that he suffered a workplace injury.

Defendant's third argument is that plaintiff cannot establish a causal connection between his alleged workplace injury and his termination from employment. Plaintiff was told to stay home from work shortly after he allegedly reported a workplace injury. He was terminated a few weeks after he suggested to Jayne Cornish that he might make a workers' compensation claim. Although there are contradictory reports in the record which are based upon plaintiff's statements to doctors or defendant's representatives, there is enough evidence in the record for the court to find that plaintiff could make a prima facie showing of a causal connection

between his alleged workplace injury and his discharge from employment. See *Rebarchek*, 35 P.3d at 901 (a prima facie case is not an "onerous burden" in this type of case).

■ Finally, defendant contends that summary judgment is warranted because the undisputed evidence shows that plaintiff was discharged because defendant believed he was unable to safely perform his work duties. Defendant has produced evidence that the decision to terminate plaintiff was based upon Dr. Hanson's opinion that plaintiff could not perform the duties of the material handler position. According to defendant, plaintiff has not produced evidence which, viewed in a light most favorable to plaintiff, would persuade a reasonable factfinder that defendant's alleged reason for terminating plaintiff is a pretext for a retaliatory discharge. We agree with this argument.

■ "A plaintiff produces sufficient evidence of pretext when [he] shows 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1280 (10th Cir.2010) (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir.2005)). "When evaluating the sufficiency of this evidence, we look to several factors, 'includ[ing] the strength of the [employee's] prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered' on a motion for summary judgment." *Id.*, quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ Typically pretext is shown in one of three ways: 1) with evidence that defendant's stated reason for the adverse employment action was false or unworthy of belief; 2) with evidence that defendant acted contrary to a written company policy; or 3) with evidence that defendant acted contrary to an unwritten policy or contrary to company practice. *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000). Evidence of pretext may include: prior treatment of plaintiff; the employer's policies and practices; disturbing procedural irregularities; and the use of subjective criteria. *Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir.), cert. denied, 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999). "'[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) quoting, *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988).

To summarize the factual record, plaintiff missed a significant amount of work in June and July 2006 because of back pain. He returned to work in late July 2006 with a release from Dr. Hanson. This was in accord with previous company practice. After he resumed working in late July and early August, plaintiff again reported back pain on August 7, 2006. He obtained a third epidural steroid shot on August 9, 2006 and saw his personal physician on August 10, 2006 which led to time off at least until August 13, 2006. At some point about this time plaintiff was told by defendant not to return to work. Plaintiff's next medical visit was with Dr. Hanson on August 22, 2006. After reviewing a CT scan done in June, Dr. Hanson told plaintiff not to return to work, but to see his personal physician and obtain a consultation from a neurosurgeon.

The neurosurgeon, Dr. Manguoglu, did not recommend surgery because plaintiff said he was pain-free.[4] Plaintiff was referred to a chiropractor, Dr. Eisenhauer, who placed restrictions on plaintiff against exertion, lifting, bending and prolonged sitting or standing, and scheduled him for several treatments. When these treatments were about completed, Dr. Eisenhauer released plaintiff to work on November 27, 2006 and plaintiff was scheduled for a return-to-work examination by Dr. Hanson. Dr. Hanson decided to order an MRI. Plaintiff had the MRI on December 15, 2006. The MRI was consistent with a CT scan conducted in June 2006 which showed spinal stenosis and a disc herniation. Dr. Hanson informed defendant on or about December 19, 2006 that plaintiff was not capable of performing the duties of a material handler. He said that plaintiff should avoid repetitive bending, stooping, lifting, twisting and climbing and should avoid lifting more than twenty pounds. Jayne Cornish and Cathy Carpenter met with plaintiff to inform him of this conclusion on December 21, 2006. In January 2007, Dr. Eisenhauer wrote that plaintiff should not engage in excessive or repetitive bending, or repetitive lifting over forty pounds.

Plaintiff makes the following arguments in support of a claim of pretext. First, plaintiff asserts that defendant refused to honor the work "releases" plaintiff obtained from other doctors. We reject this point. The record shows that Dr. Eisenhauer issued a work release for plaintiff in late November 2006. This is the only work release near the time that plaintiff was discharged. While this work release and other evidence are sufficient to establish an issue as to plaintiff's ability to do his job with defendant at the point in time, that is not the issue in this case. The issue is whether defendant believed plaintiff could safely perform his job. Looking at all the evidence, the court does not believe Dr. Eisenhauer's release together with the other evidence of plaintiff's ability to work is sufficient to establish a jury issue as to pretext.

Plaintiff had a history of back trouble. In December 2006, consistent with defendant's past practice, Dr. Hanson saw plaintiff to determine whether he should be released to work. Dr. Hanson ordered a MRI. After reviewing the MRI and finding that it did not vary from a prior CT scan, Dr. Hanson refused to release plaintiff to work as a material handler for defendant. This is consistent with Dr. Hanson's conclusion in August 2006 when he first saw the CT scan. Dr. Hanson's decision is not greatly inconsistent with Dr. Eisenhauer's January 2007 statement that plaintiff should not do repetitive bending or repetitive lifting over forty pounds. Nor does it vary greatly from Dr. Bossemeyer's August 2006 statement that plaintiff was still having problems in a less demanding job or Dr. Manguoglu's advice in September that plaintiff avoid heavy lifting, bending or twisting and that he see a chiropractor.

The job of senior material handler required the occasional lifting of 40 pounds. It also required the ability to do a material handler's job which required occasional lifting of 80 pounds. Both positions involved bending and twisting. We do not believe the evidence from other doctors, including Dr. Eisenhauer, would persuade any reasonable factfinder that Dr. Hanson's opinion was unreasonable, unworthy of belief or obtained in bad faith. Nor would it show that defendant's reliance upon Dr. Hanson's opinion was unreasonable, contrary to company practice or policy, or a pretext for retaliation.

---

**4.** Dr. Manguoglu did warn plaintiff against heavy lifting, twisting or bending.

Next, plaintiff contends that defendant's decision to remove plaintiff from work in August 2006 without a medical leave form signed by plaintiff or a doctor's statement is evidence of pretext. While this may have been a procedural irregularity, it is not so disturbing as to create a significant inference of pretext. Plaintiff reported back discomfort on August 7, 2006. He had a third epidural steroid shot on August 9, 2006. He was given a release from work by his personal physician until August 13, 2006 who indicated that plaintiff was "still having problems." Then, on August 22, 2006, Dr. Hanson advised plaintiff not to return to work and noted that plaintiff could not stand or sit for very long. He also advised plaintiff to obtain a surgical consultation. On that day a leave form was filled out and approved by plaintiff's supervisor, although plaintiff did not sign the form. Of course, all of these events preceded the decision to discharge plaintiff by a few months. Viewing the entire record, the court does not believe the absence of plaintiff's signature on a leave form or a doctor's order covering all the days of work plaintiff missed in August, creates a jury issue as to whether defendant's reasons for eventually terminating plaintiff were a pretext for retaliation.

Plaintiff contends that Nurse Ramsey's refusal to file an injury report on August 7, 2006 shows that the decision to terminate his employment was motivated to retaliate against him because he may have sustained a workplace injury. Nurse Ramsey did not participate in the decision to terminate plaintiff. Therefore, her reaction to defendant's complaint on August 7, 2006 is not evidence that the medical reasons given for the decision of Jayne Cornish and Jim York to discharge plaintiff were a pretext for retaliation. Jayne Cornish was not working for defendant in August 2006. So, she had nothing to do with Ramsey's actions. Moreover, there is no evidence that Ramsey was acting in accordance with a company policy or practice to retaliate against persons who reported workplace injuries on August 7, 2006. On the contrary, there is evidence that new employees were instructed to report workplace injuries and were told where to find the forms to do so.

Plaintiff claims that the proximity in time between his alleged references to a workplace injury and his temporary and then permanent exclusion from work at defendant's plant shows that the reasons given for his termination were a pretext for retaliation. Plaintiff allegedly reported a workplace injury to Nurse Ramsey on August 7, 2006 and then referred to the injury again in that context on December 21, 2006 when he met with Jayne Cornish and Cathy Carpenter. Plaintiff was told not to come to work in mid-August 2006 and was discharged on January 23, 2007. The Tenth Circuit has held that temporal proximity is not sufficient by itself to establish pretext. *Proctor v. United Parcel Service*, 502 F.3d 1200, 1213 n. 6 (10th Cir.2007). Even considered with plaintiff's other arguments, the court does not believe that the timing of the adverse actions against plaintiff raises a jury issue as to whether defendant's alleged reasons for the actions were a pretext for retaliation.

Finally, plaintiff contends that defendant was willing to give plaintiff time off and then allow plaintiff to return to work when plaintiff reported a non-workplace injury. According to plaintiff, it was only when he reported a workplace injury that defendant would not permit him to return to work. Plaintiff contends that this shows pretext. Dr. Hanson released plaintiff to return to work in July 2006 and previous occasions. Dr. Hanson did not release plaintiff to return to work in August or December 2006. There is no evidence that Dr. Hanson's decisions were influenced by whether plaintiff's injuries occurred at

work or off work. Plaintiff did not tell Dr. Hanson that he suffered a workplace injury. Therefore, the conjuncture of plaintiff's alleged off-the-job and on-the-job injuries and the permission to return to work does not demonstrate pretext. The critical factor in Dr. Hanson's decision appears to be his review of the CT scan and the MRI. Dr. Hanson did not see the CT scan until after August 7, 2006, and he saw the MRI on or about December 19, 2006. In both instances, Dr. Hanson did not release plaintiff to return to work.

In summary, defendant's reliance upon Dr. Hanson's opinion is not inconsistent or implausible. It may be argued that there is contrary medical opinion in the record. Such countervailing evidence suggests that Dr. Hanson was mistaken. But, it does not show that defendant's reliance upon Dr. Hanson's opinion was a pretext for retaliation or discrimination. The relevant issue for the purposes of showing pretext is not whether plaintiff could have safely performed the job of material handler. Instead, it is whether defendant honestly perceived that plaintiff could not safely perform the job of material handler because of his medical condition. See *Chen v. Dow Chemical Co.*, 580 F.3d 394, 401 (6th Cir.2009) (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713–15 (6th Cir. 2007))("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'"); *Metzler v. Federal Home Loan Bank*, 464 F.3d 1164, 1178 (10th Cir.2006)(a mistaken belief can be a legitimate reason for an employment decision); *Proctor*, 502 F.3d at 1211 (same); *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007)(same); *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1080 (10th Cir. 1999) (employer's perception of employee's performance is the critical question);

*Schauer v. BNSF Railway Co.*, 2009 WL 262110 at *6 (D.Neb.2009) (plaintiff cannot survive summary judgment simply by showing that medical opinions relied upon by defendant might be wrong). This can be a "fine line." See *Wagner v. Caterpillar Inc.*, 1997 WL 625966 at *11 (7th Cir.9/30/1997)(a workers' compensation retaliation case involving a job termination where an employer believed an employee lied about his physical condition). The court concludes on this record that the evidence does not show such weakness, inconsistency or implausibility in defendant's reliance upon Dr. Hanson's opinion that a jury issue is raised as to the issue of pretext. Therefore, the court shall grant summary judgment against plaintiff's state law retaliatory discharge claim.

## B. *FMLA claims*

Plaintiff alleges that defendant violated the FMLA by retaliating against plaintiff for taking leave allowed by the FMLA, forcing plaintiff to take an unwanted medical leave of absence, and failing to reinstate plaintiff when he was released to return to work.

The FMLA provides that eligible employees have the right to take unpaid medical leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act. 29 U.S.C. §§ 2601–2654. The FMLA also requires employers to reinstate an employee to his or her former position or its equivalent upon the employee's timely return from FMLA leave. 29 U.S.C. § 2614(a).

The Tenth Circuit discussed the two types of FMLA claims which may be alleged in *Smith v. Diffee Ford–Lincoln–Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir.2002).

Employees are authorized under 29 U.S.C. § 2617(a) to bring an action to

recover damages for violations of § 2615. Courts have recognized two theories for recovery on FMLA claims under § 2615, the retaliation or discrimination theory and the entitlement or interference theory. The retaliation or discrimination theory arises from § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." The entitlement or interference theory arises from § 2615(a)(1): "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter."

The Tenth Circuit has held that retaliation claims are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Metzler*, 464 F.3d at 1170.

> "Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case of retaliation. If plaintiff does so, then the defendant must offer a legitimate, nonretaliatory reason for the employment action. The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual."

*Id.* (citations omitted). Interference with FMLA rights is a statutory violation regardless of the employer's intent. *Id.* So, the burden-shifting analysis does not apply to interference claims. *Id.*

### 1. *Retaliation or discrimination*

■ To establish a prima facie case of retaliation, plaintiff must show: 1) that he engaged in protected activity; 2) that defendant took a materially adverse action against plaintiff; and 3) that there exists a causal connection between the protected activity and the adverse action. *Id.* at 1171.

■ Defendant admits that plaintiff can establish the first two elements of a prima facie case of retaliation. Defendant contends that summary judgment is warranted because plaintiff cannot show a causal connection between FMLA protected activity and any adverse job action, and because plaintiff cannot ultimately prove that defendant's reasons for directing plaintiff not to return to work and for discharging plaintiff were a pretext for illegal retaliation or discrimination. Defendant asserts that the record demonstrates that plaintiff was removed from work and not reinstated because of his back condition. Defendant also notes that plaintiff admits that he had previously used FMLA leave without retaliation or discrimination by defendant.

Plaintiff makes several arguments in opposition to summary judgment against his FMLA retaliation or discrimination claim. We reject these arguments.

First, plaintiff contends that the burden shifting analysis is unnecessary and inappropriate because plaintiff has direct evidence of discriminatory or retaliatory intent. According to plaintiff, this evidence is defendant's admission that plaintiff was removed from work and ultimately discharged because of his back condition. Plaintiff relies upon cases brought under the Americans with Disabilities Act (ADA).[5] Those cases do not apply here. Defendant does not admit that plaintiff suffered an adverse job action because he had a back condition which caused him to

---

**5.** Plaintiff quotes language which appears to come from *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir.2003) which, in turn, quotes from *Morgan v. Hilti*, 108 F.3d 1319, 1323 n. 3 (10th Cir.1997). However, plaintiff does not directly cite to the *Davidson* case. Doc. No. 102 at pp. 88–89.

take and eventually exhaust his FMLA leave. Defendant admits only that plaintiff suffered an adverse job action because he had a back condition which defendant believed disqualified him from performing his job requirements. Defendant's admission is not direct evidence of discriminatory or retaliatory intent to violate the FMLA.

Second, plaintiff contends that defendant, through its human resources manager Jayne Cornish, engaged in a pattern and practice of FMLA retaliation. However, plaintiff has not presented evidence to support this contention other than a reference to cases filed against defendant. It should also be noted that Cornish started her employment with defendant in late September 2006, after Dr. Hanson on August 22, 2006 initially refused to release defendant back to work.

Next, plaintiff contends that defendant ignored the work releases from three doctors, Dr. Manguoglu, Dr. Bossemeyer and Dr. Eisenhauer. The court has addressed this point with regard to the workers' compensation retaliation claim and the court's analysis will be somewhat the same. We agree with defendant that Dr. Manguoglu did not issue a work release to defendant. He simply transferred plaintiff's care to Dr. Eisenhauer. Dr. Bossemeyer gave plaintiff a note excusing him from work from August 9, 2006 to August 12, 2006. However, if Dr. Bossemeyer released plaintiff to work thereafter, the release appeared qualified with language indicating that plaintiff was in a less demanding job (when plaintiff's job description did not change), that plaintiff was still having problems, and that no specific objective evaluation had been done. Moreover, plaintiff can hardly claim that he was retaliated against for using FMLA leave, if defendant afforded him such leave even though his personal physician said he could return to work.

Some weeks after plaintiff had exhausted his FMLA leave (according to defendant's calculations), Dr. Eisenhauer gave plaintiff a release to work beginning November 27, 2006. Once again, Dr. Eisenhauer's release to return to work should not be considered evidence of FMLA retaliation when defendant continued to allow plaintiff leave from work, before and after Dr. Eisenhauer's release, in spite of the fact that plaintiff had exhausted his FMLA leave.

As previously discussed, the court does not believe the medical testimony and records in this case could demonstrate to any reasonable jury that defendant retaliated or discriminated against plaintiff or that defendant's reliance upon Dr. Hanson's refusal to return plaintiff to his job was a pretext for retaliation or discrimination. The records do not show that the support for Dr. Hanson's opinion is so weak or that defendant's reliance upon Dr. Hanson's opinion is so implausible or inconsistent that a reasonable jury could find that defendant used the opinion as a pretext for FMLA retaliation.

Plaintiff also argues that Dr. Hanson was simply obeying the instructions of defendant when Dr. Hanson removed plaintiff from work and refused to reinstate plaintiff to work. We disagree. The evidence in the record does not show or even suggest that Dr. Hanson received or obeyed a directive from defendant to prevent plaintiff from returning to work.

Plaintiff contends that defendant's reliance upon Dr. Hanson's opinion was a pretext for retaliation or discrimination because Dr. Hanson did not examine plaintiff in December 2006. Dr. Hanson did see plaintiff on December 7, 2006 and ordered an MRI. Later, he reviewed the MRI findings. He was familiar with plaintiff's medical history, work history and the job requirements for plaintiff's position

with defendant. Dr. Hanson did not issue a knee-jerk opinion that plaintiff could not return to work. We find that the absence of a detailed examination does not demonstrate that defendant's trust in Dr. Hanson's opinion was merely a pretext for retaliation or discrimination.

Plaintiff further argues that the insurance company rendered a conclusion that plaintiff was not disabled from his job as a material handler when the company reviewed plaintiff's application for short-term disability benefits. This is evidence of a disagreement as to plaintiff's ability to perform the job of material handler. It is not evidence of pretext. It does not demonstrate that employees who did not take FMLA leave were treated more favorably. It does not demonstrate that defendant ignored Dr. Hanson's opinion with employees who did not take FMLA leave. It also does not demonstrate that defendant directed or manufactured Dr. Hanson's opinion or that defendant lacked good cause to rely upon Dr. Hanson's opinion. It simply shows that there was a disagreement regarding the ability of an employee with a history of back trouble to safely perform the physical demands of a material handler position. Defendant asked the insurance company to review or reconsider its decision which is also an indication that defendant's reliance upon Dr. Hanson's opinion was not a pretext for retaliation or discrimination.

Finally, plaintiff asserts that defendant never placed plaintiff on FMLA leave or at least there is no documentation that plaintiff was placed on FMLA leave. However, if plaintiff was not placed on FMLA leave, then plaintiff cannot establish that he was retaliated against or discriminated against for taking FMLA leave.

As with plaintiff's claim of workers' compensation retaliation, the record does not support a jury issue of pretext as to FMLA retaliation. Plaintiff was not reta-

liated against or penalized by defendant when he took FMLA leave prior to August 2006. The record does not support a jury question as to whether defendant's reliance upon Dr. Hanson's opinion was a pretext for FMLA retaliation. Defendant's position has not been demonstrated to be implausible, inconsistent or incoherent. While there is contradictory medical opinion in the record, that evidence does not show that the support for Dr. Hanson's opinion is so weak or that defendant's reliance upon Dr. Hanson's opinion is so unreasonable that a jury issue exists as to pretext. Therefore, the court shall grant summary judgment against plaintiff's claim of FMLA retaliation or discrimination.

### 2. *Interference or entitlement*

Plaintiff argues that defendant illegally interfered with plaintiff's FMLA rights by placing him on FMLA leave involuntarily and by refusing to honor plaintiff's request to return to his job as a material handler.

Following the Tenth Circuit's approach in *Metzler,* 464 F.3d at 1180 and *Bass v. Potter,* 522 F.3d 1098, 1102 n. 5 (10th Cir.2008), the court believes an FMLA interference claim has the following elements: 1) that plaintiff was entitled to FMLA leave or reinstatement, 2) that some adverse action by the employer interfered with plaintiff's right to take FMLA leave or be reinstated to his job, and 3) that the employer's action was related to the exercise or attempted exercise of plaintiff's FMLA rights.

### a. *Involuntary leave*

Plaintiff claims that defendant interfered with his FMLA rights by forcing plaintiff to take FMLA leave when plaintiff wanted to work and was physically able to return to work. The Sixth Circuit has held that there may be an FMLA interference claim when an employee is denied FMLA leave because the employee had

already exhausted the available FMLA leave after the employer forced the employee to use FMLA leave when the employee did not have a serious health condition. *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 449–50 (6th Cir.2007). That scenario does not fit the facts of this case because plaintiff was not denied FMLA leave requested by plaintiff. Plaintiff was terminated allegedly because defendant determined he was not physically qualified to perform his job. Other courts have held that there is no cause of action under the FMLA for forcing an employee to take FMLA leave. See *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 174–75 (2nd Cir.2006) (involuntary leave does not violate FMLA unless shown to impinge upon some right provided under the FMLA); *Willis v. Coca Cola Enterprises, Inc.*, 445 F.3d 413, 417 (5th Cir.2006) (it is not contrary to the FMLA for an employee to be placed on "involuntary FMLA leave"); *Heyne v. HGI–Lakeside Inc.*, 589 F.Supp.2d 1119, 1128 (S.D.Iowa 2008) (same). On the basis of this authority, and because plaintiff does not claim that his right to take FMLA leave was interfered with by his involuntary placement on FMLA leave, the court shall grant summary judgment against this part of plaintiff's interference claim.

### b. *Right to reinstatement*

■ As noted previously, the FMLA requires that an "employee be restored by the employer to the position of employment held by the employee when the [FMLA] leave commenced." 29 U.S.C. § 2614(a)(1)(A). It is unlawful for any employer to interfere with this right. 29 U.S.C. § 2615(a)(1). The deprivation of this right is a violation regardless of the employer's intent. *Smith v. Diffee Ford–Lincoln–Mercury*, 298 F.3d 955, 960 (10th Cir.2002).

One of defendant's arguments against this claim is that plaintiff's FMLA leave had expired long before November 27, 2007 and, therefore, plaintiff was not entitled to reinstatement to his job even if he was physically able to perform the job. We find that this argument warrants summary judgment. Various courts have held that the right to reinstatement under FMLA expires when FMLA leave expires. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 148 (3d Cir.2004) (employee subject to discharge on the first day he is both absent from work and no longer protected by FMLA); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 161–62 (2nd Cir.1999) (no interference claim when plaintiff was unable to perform his job for two months after expiration of his 12–week FMLA period); *McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir.1999) (employee absent for more than protected period time does not have right of reinstatement even if employer provides more leave than required by FMLA); *Ackerman v. Beth Israel Cemetery Ass'n*, 2010 WL 2651299 (D.N.J.2010) (once an employee has been provided with 12 weeks of leave, the employer's obligations under the FMLA expire); *Eklind v. Cargill Inc.*, 2009 WL 2516168 (D.N.D.2009) (extension of leave time beyond that required by FMLA does not extend right to restoration of job); *Talkin v. Deluxe Corp.*, 2007 WL 1469648 at *4–5 (D.Kan.2007) (plaintiff who returns after exhausting FMLA leave cannot state an entitlement claim under the FMLA); *Mondaine v. American Drug Stores, Inc.*, 408 F.Supp.2d 1169, 1206 (D.Kan.2006) (employee is only protected under FMLA if he reports for work with the required certification when his FMLA leave concludes); *Standifer v. Sonic–Williams Motors*, 401 F.Supp.2d 1205, 1221–22 (N.D.Ala.2005) (employee not entitled to reinstatement because she took 13 weeks, not 12 weeks, off work); *Dogmanits v. Capital Blue Cross*, 413 F.Supp.2d 452, 462 (E.D.Pa.2005) (employees who ex-

ceed 12 weeks leave stand to lose right to job restoration under FMLA even if employers provided additional non-FMLA leave); *Farina v. Compuware Corp.*, 256 F.Supp.2d 1033, 1054 (D.Ariz.2003) (plaintiff who took longer than 12–week leave not entitled to reinstatement unless she was prepared to return within the period of FMLA leave allowed); *Smith v. Blue Dot Services Co.*, 283 F.Supp.2d 1200, 1205–06 (D.Kan.2003) (holding that a plaintiff who was unable to return to work before his FMLA leave expired did not allege any denial of an FMLA right); *Hanson v. Sports Authority*, 256 F.Supp.2d 927, 936 (W.D.Wis.2003) (employee may be terminated if she does not have required medical certification at the time FMLA leave concludes); *Holmes v. e.spire Communications*, 135 F.Supp.2d 657, 666–67 (D.Md.2001) (there is no FMLA remedy for restoration of job after the expiration of FMLA leave in spite of employer's policy granting additional leave); *Hite v. Biomet, Inc.*, 53 F.Supp.2d 1013, 1017–18 (N.D.Ind.1999) (stating that while an employer may grant an employee more than 12 weeks leave, the additional time is not protected leave subject to the FMLA safeguards); but see *Santosuosso v. NovaCare Rehabilitation*, 462 F.Supp.2d 590, 597–98 (D.N.J.2006) (employee did not lose FMLA protection by taking a leave longer than 12 weeks where her employer gave her permission to do so).

We find that defendant did not interfere with plaintiff's right to reinstatement under FMLA because plaintiff's FMLA right to reinstatement expired when plaintiff's FMLA-authorized leave expired.

## IV. CONCLUSION

In conclusion, for the above-state reasons, defendant's motion for summary judgment shall be granted.

**IT IS SO ORDERED.**

### MEMORANDUM AND ORDER

This case is before the court upon plaintiff's motion for reconsideration of this court's order granting defendant's motion for summary judgment.

*Legal standard*

■■■■ A motion for reconsideration is treated like a motion to alter or amend judgment pursuant to FED.R.CIV.P. 59(e). Local Rule 7.3(a). Relief under Rule 59(e) may be granted only if the moving party can establish: 1) an intervening change in the controlling law; 2) the availability of new evidence that could not have been obtained previously through the exercise of due diligence; or 3) the need to correct clear error or prevent manifest injustice. *Satterlee v. Allen Press, Inc.*, 455 F.Supp.2d 1236, 1241 (D.Kan.2006) (citing *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir.1995)). A motion for reconsideration is an "inappropriate vehicle to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion.... Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law. It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir.2000) (citations omitted).

*Court's prior order*

The court's summary judgment order addressed two major claims: retaliation against the exercise of plaintiff's worker's compensation rights; and violation of plaintiff's rights under the Family and Medical Leave Act (FMLA). Plaintiff argued that he was terminated in retaliation for the exercise or potential exercise of his

worker's compensation rights. Defendant argued that it relied upon Dr. David Hanson's opinion that for medical reasons plaintiff should not return to his job with defendant. The court held that plaintiff could not demonstrate that defendant's reliance upon Dr. Hanson's opinion was a pretext for illegal retaliation.

Regarding plaintiff's FMLA claims, the court held that plaintiff was not retaliated against or discriminated against for exercising his rights under the FMLA because he had used FMLA leave previously without retaliation or discrimination and because he was terminated from his position because defendant believed his medical condition prevented him from performing his job. The court further held that defendant did not interfere with plaintiff's exercise of FMLA rights by forcing plaintiff to take FMLA leave when plaintiff wanted to work or by denying plaintiff the right to reinstatement after his FMLA leave had expired.

*Plaintiff's arguments for reconsideration of his worker's compensation retaliation claim*

Plaintiff's first argument for reconsideration is that the court glossed over the fact that, after plaintiff reported a work-related injury on August 7, 2006, he was removed from work without any evidence that he was not able to work. The court rejects this point. The court referred to the events of August 2006 frequently in the summary judgment order and considered the question of whether they created a jury issue regarding pretext. Plaintiff argues that "defendant's retaliatory conduct must be measured at the point in time when defendant removed [plaintiff] from work on August 7, 2006 without any reason." Doc. No. 110 at p. 3. The court certainly did consider the alleged retaliatory conduct

from August 7, 2006 forward in rendering a decision.

It was undisputed that plaintiff was terminated from employment by defendant on January 23, 2007, not August 7, 2006. Compare defendant's SOF # 210 at Doc. 95 p. 26 with plaintiff's response at Doc. 102 p. 44. Plaintiff did not argue that he was actually terminated in August 2006. Nor did plaintiff argue that he was asking to recover for worker's compensation retaliation by any means other than termination. See final pretrial order, Doc. 92 at pp. 7–10 & 17–18 (listing termination as the retaliatory action, listing termination as an element of recovery, and listing loss of wages after December 23, 2006 as plaintiff's damages).[1] In sum, the court considered the events of August 2006 in determining the question of pretext. The court did not consider whether plaintiff was terminated from employment on August 2006 because plaintiff did not make that argument; nor does the record appear to support such an argument.

■■■ Next, plaintiff argues that defendant cannot justify terminating plaintiff on the basis of "after-acquired evidence" that plaintiff was not able to perform the required work. We also reject this argument. Plaintiff was terminated on January 23, 2007. On December 21, 2007, plaintiff was told by defendant's human resources manager, Jayne Cornish, that she did not believe he could perform the work required by his position and that defendant would see if other jobs with the company were available for plaintiff. Plaintiff was terminated on January 23, 2007 when no other jobs were found for plaintiff. There is no indication that the decision to terminate plaintiff was based upon "after-acquired evidence" unless one

---

1. In the final pretrial order, plaintiff listed December 23, 2006 as the termination date, although he later agreed in response to defen-

dant's summary judgment motion that the termination date was January 23, 2007.

decides that plaintiff was terminated in August 2006. As already mentioned, this was not argued by plaintiff prior to the summary judgment motion or asserted in the final pretrial order.[2] Moreover, the summary judgment record does not support plaintiff's "after-acquired evidence" contention. The record indicates that Jayne Cornish consulted with Dr. Hanson regarding plaintiff's medical condition and Dr. Hanson informed Cornish that he did not believe it was safe for plaintiff to return to plaintiff's job. See Cornish deposition, Doc. No. 95, Ex. 2 at pp. 43–45 and Cornish deposition, Doc. No. 102, Ex. 2 at pp. 56–57, 73; Carpenter deposition, Doc. No. 95, Ex. 3 at p. 13 and Carpenter deposition, Doc. No. 102, Ex. 2 at pp. 24, 34; Hanson deposition, Doc. No. 102, Ex. 3 at p. 62. After this consultation, the decision was made to ban plaintiff from returning to his position and later to terminate plaintiff's employment entirely.

Plaintiff next argues that the court disregarded plaintiff's contention that Dr. Hanson was directed by Jayne Cornish to refuse to release plaintiff to return to his job. This is incorrect; the court addressed the issue at page 30 of the summary judgment order. Plaintiff draws his argument from what he describes as Dr. Hanson's clear and unequivocal testimony that he was supervised by Cornish. Actually, in his deposition Dr. Hanson agreed to a characterization that Cornish was "sort of" his supervisor and that she would provide him direction as to "what kinds of things to do." Hanson deposition, Doc. No. 102, Ex. 3 at p. 7. To the court, this is less than clear and unequivocal, and in any event does not support plaintiff's contention that Dr. Hanson gave medical opinions as dictated by defendant. Indeed, a

fair review of the summary judgment record could not lead to a reasonable conclusion that Dr. Hanson molded his medical opinions according to the directions of Jayne Cornish or anyone else at defendant. Dr. Hanson specifically denied doing so when he testified that after August 22, 2006 he was not asked by anyone working for defendant to refuse plaintiff a release to return to work. Hanson deposition, Doc. No. 102, Ex. 3 at p. 63.

Plaintiff follows this argumentation with additional points which either were or could have been raised in his response to the summary judgment motion. Plaintiff argues that Dr. Hanson did not place restrictions on plaintiff's work capacity and was unwilling to say in his deposition whether he knew if plaintiff was able to perform duties requiring occasional walking, sitting, lifting, bending and twisting in January 2007 (the month following the denial of his release to return to work). These arguments do not reach the critical issue of pretext. Defendant asked Dr. Hanson for an opinion in December 2006. Dr. Hanson rendered the opinion in December 2006 after ordering an MRI and reviewing it. He did not examine or discuss the matter with plaintiff and was not placed in a position to give restrictions *to plaintiff*, although the opinion he gave to Cornish obviously was that it was unsafe for plaintiff to return to his job. He was not plaintiff's doctor. Nor was he asked by plaintiff or defendant to examine plaintiff or otherwise assess his fitness for work in January 2007. Defendant's arguments do not suggest to the court that defendant's reliance upon Dr. Hanson's opinion was a pretext for retaliation.

**2.** The parties are bound by the contents of a pretrial order unless the order is modified to prevent injustice. See *Wilson v. Muckala*, 303 F.3d 1207, 1215–16 (10th Cir.2002)(the pretrial order supersedes the pleadings and establishes the issues to be considered at trial); *Perry v. Winspur*, 782 F.2d 893, 894 (10th Cir.1986).

Plaintiff contends that the most damaging evidence of pretext is that Cornish asked Dr. Hanson to write a note regarding plaintiff's situation which could be sent to a short-term disability insurance carrier to help plaintiff obtain short-term disability benefits. Dr. Hanson did dictate such a note, which was undated. The note did not persuade the insurance carrier to grant disability benefits.

Plaintiff contends this represents a disturbing irregularity which is proof of pretext. But, proof of an irregularity requires proof of the standard or ordinary procedure. There is no argument which substantiates that there was a variance from defendant's standard procedure or policy in these matters. Defendant asked Dr. Hanson to give a clearance for plaintiff to return to work, as previously done in June, July, and August 2006 as well as in 2003 and 2005 with regard to plaintiff. The absence of a date on a memo may be a departure from form, but not a significant one in the general context of the summary judgment record. There is no indication that Dr. Hanson's opinion regarding plaintiff changed substantially after he first saw plaintiff's CT scan in August 2006. Plaintiff does not persuasively contend that Dr. Hanson's opinion changed suspiciously over the course of time or claim that the undated memo does not reflect Dr. Hanson's genuine opinion.

Plaintiff does argue in the motion for reconsideration, as he did in response to the summary judgment motion, that defendant and Dr. Hanson allowed plaintiff to return to work *until* plaintiff claimed a job-related injury. The court addressed this argument at pages 23–24 of the summary judgment order. The "change" in Dr. Hanson's opinion is not suspicious for the reasons discussed there and elsewhere in the order.

Plaintiff also argues that the memo shows that Dr. Hanson took orders from Jayne Cornish. It does show that Dr. Hanson dictated a note regarding an employee when one was requested by Cornish. It does not show that Cornish controlled what Dr. Hanson said in the note. Therefore, it is not proof of pretext.

After a careful review of the issues raised in the motion for reconsideration, the court believes that there are no grounds to alter or amend the court's decision as to plaintiff's worker's compensation retaliation claim.

*Plaintiff's arguments for reconsideration of his FMLA claims*

Plaintiff argues that the court's rulings upon his FMLA claims are internally inconsistent. The court made the following rulings regarding plaintiff's FMLA claims. First, the court held that plaintiff could not show that he was retaliated or discriminated against for FMLA protected activity. Plaintiff does not address this ruling in his motion for reconsideration. The court also held that plaintiff could not succeed in claiming that his FMLA rights were violated when he was forced to take FMLA leave involuntarily. The court stated that plaintiff did not claim that he was denied FMLA leave when he requested it and that the facts of this case did not support an FMLA interference claim as discussed in four different cases. Finally, citing multiple cases, the court held that plaintiff's right to reinstatement under the FMLA was not violated because his right to reinstatement expired when his FMLA leave expired, which was before he was released to return to work.

The inconsistency charged by plaintiff essentially argues that the alleged involuntary placement of plaintiff upon FMLA leave impinged upon his right to reinstatement under the FMLA because it led to the exhaustion of plaintiff's FMLA leave. This is a different argument than plaintiff made in his response to the summary

**1220**

judgment motion. But, in any event, it should be rejected because, as detailed in defendant's response to the motion for reconsideration, there were more than 12 weeks of FMLA leave granted to plaintiff which were not involuntary. Plaintiff exhausted his allotted 12 weeks of FMLA leave long before his date of termination and even before his meeting with Jayne Cornish in December 2006. Therefore, plaintiff cannot claim that his alleged "involuntary" placement on FMLA leave impinged upon his right to reinstatement.

Plaintiff further suggests that he was never placed on FMLA leave, claiming a lack of evidence or records that show he was placed on FMLA leave or that plaintiff was informed that his FMLA leave had expired. The court rejects this point because there is an affidavit from Jayne Cornish which states that plaintiff took FMLA leave and applied for and received short-term disability benefits for June 2, 2006 through July 15, 2006 and from August 10, 2006 through the exhaustion of his FMLA leave and short-term disability benefits. Doc. No. 95, Exhibit 25; see also Cornish deposition, Doc. No. 95, Ex. 2 at pp. 49–50. Furthermore, if plaintiff was not placed on FMLA leave as he suggests, then he could not claim that defendant interfered with his right to reinstatement upon return from FMLA leave.

*Conclusion*

In conclusion, for the above-stated reasons the court shall deny plaintiff's motion for reconsideration.

**IT IS SO ORDERED.**